UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL DELONGIS,

        Petitioner,

    v.

DERRICK L. OLLISON, Warden,

        Respondent.

_____/

No. C 06-4236 PJH

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

      Before this court is the petition for writ of habeas corpus filed by state prisoner Michael DeLongis ("DeLongis") pursuant to 28 U.S.C. § 2254. Having reviewed the parties' papers, the record, and having carefully considered their arguments and relevant legal authorities, the court DENIES DeLongis' petition.

<div align="center">

**BACKGROUND**

</div>

**I.    Procedural History**

      On September 25, 2003, a jury convicted DeLongis of second-degree murder and corporal injury on a spouse in connection with the death of his wife, Kim DeLongis. The jury also found true the allegation of great bodily injury in connection with the corporal injury charge. On October 30, 2003, the trial court sentenced DeLongis to a state prison term of 23 years to life.

      The California Court of Appeal denied Delongis' direct appeal on February 3, 2005. The California Supreme Court then denied review on April 13, 2005.

      DeLongis filed the instant federal habeas petition on July 10, 2006. On August 14,

<div style="writing-mode: vertical-rl">

**United States District Court**
For the Northern District of California

</div>

1    2006, the court granted a stay pending exhaustion of one of the issues raised by DeLongis.

2    The California Supreme Court denied DeLongis' habeas petition on this issue in a postcard

3    denial on January 24, 2007.  On February 21, 2007, the court lifted the stay and

4    administratively re-opened the matter.

5    **II.    Factual History**

6         DeLongis' conviction arose from the following facts.  A more extensive summary can

7    be found in the state appellate court's February 3, 2005 opinion.  *See* Ex. 7.

8         DeLongis and his wife, Kim DeLongis ("Kim") had lived together in Petaluma,

9    California since 1994.  There was no history of violence in the relationship.  The primary

10   source of conflict in the marriage was DeLongis' persistent and excessive alcohol

11   consumption.  DeLongis claimed that his intermittent agoraphobia and anxiety attacks were

12   somewhat ameliorated by drinking.

13        On the evening of September 2, 2002, DeLongis and Kim argued about his drinking,

14   and Kim alluded to a potential divorce.  They went to bed very angry with each other, and

15   the tension remained when they awoke the following morning.  DeLongis drank some beer

16   and a half bottle of wine and went upstairs to say goodbye to Kim before leaving for work.

17   Kim told DeLongis that she "hated" him and "wanted a divorce."

18        DeLongis was frightened and angry with the realization based on the "hate in her

19   eyes" that Kim was really "going to leave" him.  DeLongis testified that he then "snapped"

20   and, as Kim walked toward the top of the stairs, he kicked her from behind.  Kim fell "head

21   first" to the bottom of the stairs.

22        DeLongis testified that he did not have a clear recollection of the ensuing events,

23   and that he felt as if he "was in a movie."  He flew down the stairs in a rage and noticed a

24   hole in the wall on the way down.  He could not tell if Kim was alive when he reached her.

25   He grabbed her hair and "smashed her head into the floor."  He then choked her, and did

26   not remember stopping.

27        Delongis' next recollection is of washing the blood from his hands and dialing 911.

28

2

He told the dispatcher that his wife had fallen down the stairs and may not be breathing. When the paramedics, firefighters and police officers arrived, they observed Kim lying on the floor at the bottom of the stairs.  Her neck was swollen and bruised on both sides of the trachea, and she appeared "blue from the neck up" due to lack of oxygen.  A paramedic testified that her condition indicated she had not been breathing for a much longer time than it took to respond to the call.  She was declared dead at the scene shortly after the paramedics arrived.

Under questioning at his house and later that morning at the police station, DeLongis repeatedly told officers that he was outside in the yard when Kim fell down the stairs.  He stated that he went inside and attempted to perform CPR.  Later that evening, however, DeLongis admitted that he kicked Kim down the stairs and strangled her.  He later testified to these actions at trial.

The autopsy revealed that Kim suffered multiple blunt force lacerations and abrasions to the head, neck, face, and torso, all of which were inflicted before she died but none of which were fatal.  A forensic pathologist testified that he believed a serious laceration to Kim's forehead was caused by a "tremendous amount of force" used to smash her head into the wall where the hole was found, rather than from the fall down the stairs. The cause of her death was asphyxia due to manual strangulation.  Kim's injuries also indicated that she was conscious and struggling when she was strangled.

The defense presented testimony from a forensic toxicologist that a blood sample taken from defendant at 11:00 o'clock in the morning measured his blood-alcohol level at .19.  Thus, based upon the rate of "elimination" of alcohol from the body, his blood-alcohol level two hours earlier when the police arrived at his home was between .21 and .22. Although "people have different types of tolerance" to alcohol, anyone with a blood-alcohol level of around .21 will suffer "cognitive or decision-making" impairment, lowered self-control and inhibitions, a decrease in the ability to perceive and comprehend, along with a decline in "critical judgment."

United States District Court

For the Northern District of California

1   The chief psychologist for the Pleasant Valley State Prison offered his opinion for the

2   defense that when the killing occurred, DeLongis suffered from alcohol dependence – in

3   remission following his incarceration – and personality disorder with traits of agoraphobia,

4   anxiety, paranoia, and depression, but no organic brain ailment.  Upon evaluation, the

5   psychologist found DeLongis to be very controlling and jealous of his wife. He testified that

6   people who suffer from DeLongis' personality traits are "particularly susceptible to a rage

7   reaction," especially in a stressful situation with the "disinhibiting effects of alcohol."  The

8   psychologist also testified that a rage reaction is an "instantaneous response" to external

9   stimuli rather than the product of "considered thought."  A psychiatrist at the Sonoma

10   County jail also testified that while DeLongis was in the mental health unit, he experienced

11   alcohol withdrawal symptoms, including visual hallucinations, disorientation, and delirium

12   tremors.

### ISSUES

14   DeLongis asserts the following claims as grounds for federal habeas corpus relief:

15   (1) the trial court's failure to instruct on the intoxication defense violated his due
    process and fair trial rights; and

16

17   (2) the trial court's failure to properly instruct on his mental disorder violated his due
    process and fair trial rights.

### STANDARD OF REVIEW

19   This court may entertain a petition for writ of habeas corpus "in behalf of a person in

20   custody pursuant to the judgment of a state court only on the ground that he is in custody in

21   violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

22   Because the petition in this case was filed after the effective date of the Antiterrorism and

23   Effective Death Penalty Act of 1996 (AEDPA), the provisions of that act apply here.  *See*

24   *Lindh v. Murphy*, 521 U.S. 320, 327 (1997).  Under the AEDPA, a district court may not

25   grant a petition challenging a state conviction or sentence on the basis of a claim that was

26   reviewed on the merits in state court unless the state court's adjudication of the claim: "(1)

27   resulted in a decision that was contrary to, or involved an unreasonable application of,

28

4

United States District Court

For the Northern District of California

1   clearly established Federal law, as determined by the Supreme Court of the United States;

2   or (2) resulted in a decision that was based on an unreasonable determination of the facts

3   in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

4        A state court decision is "contrary to" Supreme Court authority, falling within the first

5   clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

6   reached by [the Supreme] Court on a question of law or if the state court decided a case

7   differently than [the Supreme] Court has on a set of materially indistinguishable facts."

8   *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  "'[C]learly established federal law' under

9   § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at

10  the time the state court renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72

11  (2003).  This "clearly established" law "refers to the holdings, as opposed to the dicta, of

12  [Supreme] Court decisions as of the time of the relevant state-court decision."  *Id.*

13       "Under the 'unreasonable application' clause" of § 2254(d)(1), a federal habeas court

14  may grant the writ if the state court identifies the correct governing legal principle from [the

15  Supreme] Court's decisions but unreasonably applies that principle to the facts of the

16  prisoner's case."  *Lockyer*, 538 U.S. at 75.  However, this standard "requires the state court

17  decision to be more than incorrect or erroneous."  *Id.*  For the federal court to grant habeas

18  relief, the state court's application of the Supreme Court authority must be "objectively

19  unreasonable."  *Id.*  The "objectively unreasonable" standard is different from the "clear

20  error" standard in that "the gloss of clear error fails to give proper deference to state courts

21  by conflating error (even clear error) with unreasonableness."  *Id.*; *see also Clark v.

22  Murphy*, 331 F.3d 1062, 1068 (9th Cir. 2003).  Therefore, "[i]t is not enough that a habeas

23  court, in its independent review of the legal question, is left with a firm conviction that the

24  state court was erroneous . . . Rather, the habeas court must conclude that the state

25  court's application of federal law was objectively unreasonable."  *Andrade*, 538 U.S. at 75;

26  *see also Clark*, 331 F.3d at 1068.

27       As for state court findings of fact under § 2254(d)(2), a federal court may not grant a

28

5

United States District Court

For the Northern District of California

1   habeas petition by a state prisoner unless the adjudication of a claim on the merits by a

2   state court "resulted in a decision that was based on an unreasonable determination of the

3   facts in light of the evidence presented in the state court proceeding."  28 U.S.C.

4   § 2254(d)(2).  The "clearly erroneous" standard of unreasonableness that applies in

5   determining the "unreasonable application" of federal law under § 2254(d)(1) also applies in

6   determining the "unreasonable determination of facts in light of the evidence" under

7   § 2254(d)(2).  *See Torres v . Prunty*, 223 F.3d 1103, 1107-08 (9th Cir. 2000).  To grant

8   relief under § 2254(d)(2), a federal court must be "left with a firm conviction that the

9   determination made by the state court was wrong and that the one [petitioner] urges was

10  correct."  *Id.* at 1108.

11          However, when the state court decision does not articulate the rationale for its

12  determination or does not analyze the claim under *federal* constitutional law, a review of

13  that court's application of clearly established federal law is not possible.  *See Delgado v.*

14  *Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000); *see also* 2 J. Liebman & R. Hertz, Federal

15  Habeas Corpus Practice and Procedure § 32.2, at 1424-26 & nn. 7-10 (4th ed. 2001).

16  When confronted with such a decision, a federal court must conduct an independent review

17  of the record and the relevant federal law to determine whether the state court's decision

18  was contrary to, or involved an unreasonable application of, "clearly established federal

19  law."  *Delgado*, 223 F.3d at 982.

20          When a state court does not furnish a basis for its reasoning, we have no
        basis other than the record for knowing whether the state court correctly
21      identified the governing legal principle or was extending the principle into a
        new context. . . .[A]lthough we cannot undertake our review by analyzing the
22      basis for the state court's decision, we can view it through the 'objectively
        reasonable' lens ground by *Williams*[, 529 U.S. 362]. . . . Federal habeas
23      review is not de novo when the state court does not supply reasoning for its
        decision, but an independent review of the record is required to determine
24      whether the state court clearly erred in its application of controlling federal
        law. . . .  Only by that examination may we determine whether the state
25      court's decision was objectively reasonable.

26  *Id.*

                                    **DISCUSSION**

27          DeLongis raised only the intoxication instruction issue in his direct appeal before the

28

6

United States District Court

For the Northern District of California

state courts, and only that issue was addressed by the state courts in a written, reasoned decision.  DeLongis raised the mental disorder instruction claim only in his habeas petition before the California Supreme Court.  Because that court issued only a postcard denial of DeLongis' habeas petition, there is no written, reasoned state court decision on the mental disorder claim.  Accordingly, the court was required to conduct an independent review of the record and the relevant federal law in determining whether the state court's decision on that issue was "contrary to, or involved an unreasonable application of, clearly established federal law."  *Delgado*, 223 F.3d at 982.

## I.   The Trial Court's Failure to Instruct on the Intoxication Defense did not Violate DeLongis' Due Process or Fair Trial Rights

DeLongis contends that his constitutional rights were violated when the trial judge failed to instruct the jury on California Jury Instructions, Criminal ("CALJIC")  4.21.1.  The unmodified instruction provides:

> It is the general rule that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition.

> Thus, in the crime[s] of ___ charged in Count[s] ___, [or the crime of ___ which is lesser thereto,] the fact that the defendant was voluntarily intoxicated is not a defense and does not relieve defendant of responsibility for the crime. This rule applies in this case only to the crime[s] of ___ [.] [, and the lesser crime[s] of ___ .]

> However, there is an exception to this general rule, namely, where a [specific intent] [or] [mental state] is an essential element of a crime. In that event, you should consider the defendant's voluntary intoxication in deciding whether the defendant possessed the required [specific intent] [or] [mental state] at the time of the commission of the alleged crime.

> Thus, in the crime[s] of ___, ___, ___, charged in Count[s] ___, [or the lesser crime[s] of ___,] a necessary element is the existence in the mind of the defendant of [a] certain [specific intent[s]] [or] [mental state[s]] which is included in the definition of the crime[s] set forth elsewhere in these instructions.

> If the evidence shows that a defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether or not [that] defendant had the required [specific intent] [or] [mental state].

> If from all the evidence you have a reasonable doubt whether a defendant had the required [specific intent] [or] [mental state], you must find that defendant did not have that [specific intent] [or] [mental state].

CALJIC 4.21.1.

7

**A.      Background**

At trial, DeLongis presented evidence of his alcohol dependence and of the effects it may have had on his cognitive abilities.  DeLongis testified that he had been drinking regularly since he was fifteen years old.  Reporter's Transcript ("RT") 896.  His drinking continued after he was married and it became a source of conflict between he and Kim.  RT 906-10.  By 2001, DeLongis was drinking twelve to eighteen beers a day, and was also drinking wine.  RT 904.  DeLongis testified that on the evening before the offense, he drank beer several times throughout the night.  RT 916-17.  He testified that, the next morning, he drank two beers, and perhaps more, shortly before the offense took place.  RT 919, 921.  The parties stipulated that the blood alcohol level in a sample drawn from DeLongis at 11:00 a.m. on September 3, 2002, measured .19.  RT 988-989.

In describing the moments leading up to the offense, DeLongis testified that he did not "really remember what happened."  RT 923.  After kicking Kim down the stairs, DeLongis explained that he "didn't hear anything after that" and that he "saw like tunnel vision, like [he] was in a movie."  RT 923.  He stated that he felt "rage" and "anger," that "his heart was pounding out of [his] chest[,]" and that he was "dizzy."  RT 925-26.  He also described the experience as ". . . I can't feel anything.  I'm not there.  It's like I'm not there."  RT 924.  DeLongis then explained that he did not recall certain details about what happened after the incident.  He testified that he "[did not] remember stopping.  [He did not] remember her standing up, [he] just remember[ed] being [sic] standing in the dining room, facing the phone."  RT 924.  While talking to an officer who had arrived at the scene, DeLongis testified that it was "[l]ike [he] wasn't totally there."  RT 929.

Anne ImObersteg ("ImObersteg"), a forensic toxicologist, testified that she could estimate DeLongis' blood-alcohol level at an earlier time based on the 11:00 a.m. sample.  RT 990.  Taking into consideration the effect of DeLongis' chronic alcohol use on the elimination of alcohol from his system, ImObersteg calculated that his blood-alcohol level was between .21 and .22 at the time of the offense.  RT 990-92.

ImObersteg then testified that, at a blood-alcohol level of around .12, the frontal lobe

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

1  of an alcohol tolerant person is affected.  RT 992.  She testified that decision-making,

2  inhibitions and cognitive abilities may be affected.  RT 992.  As the blood-alcohol level

3  increases to the range of .09 to .25, there may be evidence of short and long-term memory

4  loss.  RT 993.  ImObersteg stated that a blood-alcohol level above .21 could produce

5  blackouts and could affect a person's ability to evaluate the outcome of a given set of

6  circumstances.  RT 993.

7        DeLongis then presented testimony from Dr. William Alvarez ("Dr. Alvarez"), a

8  psychologist and the chief of mental health services at Pleasant Valley State Prison.  RT

9  1026.  Dr. Alvarez testified that he evaluated DeLongis by reading various reports and

10  administering psychological tests.  RT 1032-33.  In addition to certain findings on DeLongis'

11  psychological condition, Dr. Alvarez determined that DeLongis was alcohol dependent.  RT

12  1043, 1052.  Dr. Alvarez further concluded that, after his initial incarceration, DeLongis had

13  exhibited alcohol withdrawal symptoms that only five percent of alcohol dependent

14  individuals exhibit.  RT 1053.

15        At the close of evidence, both the prosecutor and defense counsel requested that

16  the court instruct the jury with CALJIC 4.21.1, as set forth above.  RT 1172.  That

17  instruction generally instructs the jury to consider the defendant's voluntary intoxication in

18  deciding whether he or she possessed the required mental state at the time of the alleged

19  crime.  The prosecutor asked that the court read CALJIC 4.21.1 as it applied to "mental

20  state" rather than to "specific intent" because the issue before the jury was DeLongis'

21  mental state.  RT 1173.  The judge agreed to instruct the jury on CALJIC 4.21.1, stating:

22  "I'll give 4.21.1.  I'll change the order in which I read it so that it's consistent with count one

23  being discussed first, count two being discussed second and I'll make reference to the

24  bracketed phrases only in terms of mental state.  That is 4.21.1."  RT 1174.  The judge then

25  agreed to specify that the instruction only applied to first-degree murder.[1]  RT 1174-75.

26  _____

27       [1] The judge's statement that he would read CALJIC 4.21.1 to apply only to first-degree
28  murder is ambiguous.  He may have meant that it applied only to first-degree murder and not
the lesser-included offenses.  But the more likely intent was that it would apply only to the first-
degree murder *count* (and, by implication, the lesser-included offenses of that count) and not

**United States District Court**

For the Northern District of California

1   Both the prosecutor and defense counsel also requested CALJIC 4.22, and the judge

2   agreed to give it.  RT 1175.  Unlike 4.21.1, CALJIC 4.22 simply defines voluntary

3   intoxication.[2]

4        At the close of evidence, and again after closing arguments, the judge instructed the

5   jury regarding DeLongis' alleged mental disorder and intoxication as follows:

6        In the crimes charged in count one, first degree murder or those which are lesser
         crimes to first degree murder, namely second degree murder and manslaughter,
7        there must exist a union or joint operation of fact or conduct and a certain mental
         state in the mind of the perpetrator.  Unless this mental state exists, the crime
8        to which it relates is not committed.

9        . . . .

10       You have received evidence regarding mental disorder of the defendant at the
         time of the commission of the crimes charged in counts one and two; namely,
11       first degree murder and willful infliction of a traumatic injury upon one's spouse.
         You should consider this evidence solely for the purpose of determining whether
12       the defendant actually premeditated, deliberated or harbored malice
         aforethought which is an element of the crime charged in count one; namely, first
13       degree murder.

14       Defenses.  Intoxication of a person is voluntary if it results from the willing use
         of any intoxicating liquor, drug or other substance knowing that it is capable of
15       an intoxicating effect and when he willingly assumes the risk of that effect.

16       Voluntary intoxication including [sic] the voluntary ingestion, injecting or taking
         by in [sic] other means of any intoxicating liquor, drug or other substance.

17  RT 1221-23.

18
         The judge then instructed the jury on the elements of first-degree murder and the
19
    definition of malice aforethought.  RT 1223-25.  Next, the judge instructed on the elements
20
    of second-degree murder and voluntary manslaughter.  RT 1225-26.  The judge then
21
    explained how a sudden provocation can reduce an unlawful killing from murder to
22
    voluntary manslaughter, RT 1226-28, and how a killing without malice aforethought or
23

24  to the corporal injury on a spouse count.

25       [2] The unmodified CALJIC 4.22 provides:

26       Intoxication of a person is voluntary if it results from the willing use of any
         intoxicating liquor, drug or other substance, knowing that it is capable of an
27       intoxicating effect or when [he] [she] willingly assumes the risk of that effect.
         Voluntary intoxication includes the voluntary ingestion, injecting or taking by any
28       other means of any intoxicating liquor, drug or other substance.

10

United States District Court

For the Northern District of California

1  intent to kill is involuntary manslaughter.  RT 1229-30.  Thus, though the judge defined

2  voluntary intoxication using CALJIC 4.22, and discussed the required mental elements for

3  the different types of homicides, the judge did not instruct on CALJIC 4.21.1.

4      A comprehensive review of the trial transcript indicates that trial counsel did not

5  object to the court's failure to give CALJIC 4.21.1.[3]  Nor does the record indicate why the

6  judge chose not to instruct on CALJIC 4.21.1.  The "History Index," contained in the

7  Superior Court's clerk's file, which appears to list every instruction given by the court, lists

8  CALJIC 4.22 but does not list 4.21.1.  CT 33-34.  Though the record does not reveal the

9  trial court's rationale for omitting CALJIC 4.21.1, this court treats the omission as a refusal

10  to instruct, rather than as a simple mistake, as DeLongis urges.  However, either way, the

11  analysis is the same since a failure to give an instruction is treated the same as a refusal to

12  give the instruction.

13                    **B.    State Appellate Court Decision**

14      In a written decision, the California Court of Appeal affirmed DeLongis' conviction

15  and rejected his arguments regarding the intoxication instruction.  The court noted that a

16  trial court must give a requested instruction concerning a defense only if there is substantial

17  evidence to support the defense.  *People v. Moore*, 96 Cal.App.4th 1105, 1116 (2002).

18  More specifically, the court stated that two distinct elements must be present to justify use

19  of CALJIC 4.21.1: (1) substantial evidence of actual intoxication; and (2) substantial

20  evidence that the intoxication affected the defendant's actual formation of specific intent, or

21  in other words, its effect upon the presence of the mental state of malice.  *People v.*

22  *Williams*, 16 Cal.4th 635, 677 (1997).

23      The court found that there was considerable evidence of DeLongis' intoxication.

24  However, the court held that there was not substantial evidence in the record that the

25  voluntary intoxication precluded DeLongis from forming the intent to kill.  The court

26  _____

27  [3] Although counsel failed to object, the state did not raise the issue before the state
    appellate courts on appeal.  Thus, there was no argument that DeLongis had waived the issue.
28  Accordingly, there is also no argument that DeLongis has defaulted this federal claim in state
    court pursuant to an independent and adequate state procedural rule.

United States District Court

For the Northern District of California

1    observed that DeLongis had not testified that he felt impaired by his drinking on the

2    morning of the killing, and that to the contrary, he had testified to performing routine

3    household tasks.  The court also determined that DeLongis' description of the killing

4    indicated that he was conscious of perpetrating a deadly assault on his wife.  With regard to

5    expert testimony, the court found that no testimony was presented that the intoxication

6    affected DeLongis' mental state in a manner that negated malice.  The court concluded that

7    the essence of DeLongis' defense was that he had acted upon his wife's expression of

8    animosity, and not that his intoxication prevented the formation of malice.  Accordingly, the

9    court held that the CALJIC 4.21.1 instruction was not supported by substantial evidence.

10    Finally, the court held that even if the trial court had erred by failing to instruct on

11    CALJIC 4.21.1, the error would not be prejudicial.  The court noted that the jury had

12    received instructions on manslaughter and on the definition of voluntary intoxication.  The

13    court therefore held that the jury had been effectively advised that if DeLongis was in an

14    intoxicated state and malice was negated due to provocation of sudden quarrel or heat of

15    passion, the offense was manslaughter rather than murder.  Accordingly, the court found

16    that it was not reasonably probable that a result more favorable to DeLongis would have

17    been reached had the judge instructed on CALJIC 4.21.1.

18    **C.    Legal Standards**

19    A state trial court's failure to give an instruction does not alone raise a ground

20    cognizable in a federal habeas corpus proceeding.  *See Dunckhurst v. Deeds*, 859 F.2d

21    110, 114 (9th Cir. 1988).  The error must so infect the trial that the defendant was deprived

22    of the fair trial guaranteed by the Fourteenth Amendment.  *See id.*  Whether a constitutional

23    violation has occurred will depend upon the evidence in the case and the overall

24    instructions given to the jury.  *See Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir. 1995).

25    In *Matthews v. United States*, the Supreme Court held that "a defendant is entitled to

26    an instruction as to any recognized defense for which there exists evidence sufficient for a

27    reasonable jury to find in his favor."  *485 U.S. 58, 63* (1988).  The failure to provide

28    adequate instructions on a defense theory of the case constitutes a denial of due process

12

United States District Court

For the Northern District of California

1   under the Fourteenth Amendment. *See Bradley v. Duncan*, 315 F.3d 1091, 1099 (9th Cir.

2   2002); *Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 1999). However, "[a]n omission, or an

3   incomplete instruction, is less likely to be prejudicial than a misstatement of the law."

4   *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). Thus where the alleged error is the failure

5   to give an instruction, the habeas petitioner's burden is especially heavy. *See id.*

6       **D.    Analysis**

7       DeLongis first contends that substantial evidence in the record supported a CALJIC

8   4.21.1 instruction. He maintains that his primary defense theory was that his intoxication

9   and mental illness prevented him from developing the intent required for a murder

10   conviction. DeLongis argues that his own testimony, in conjunction with that of ImObersteg

11   and Dr. Alvarez, constituted sufficient evidence to support a CALJIC 4.21.1 instruction.

12   DeLongis also argues that the trial judge's initial decision to give the instruction further

13   demonstrates that there was substantial evidence to support the intoxication instruction.

14   DeLongis then notes that the Supreme Court has held that "a defendant is entitled to an

15   instruction as to any recognized defense for which there exists evidence sufficient for a

16   reasonable jury to find in his favor." *Mathews*, 485 U.S. at 63. Lastly, DeLongis contends,

17   citing *Bradley*, that the Ninth Circuit found that the *Matthews* rule can serve as a basis for

18   habeas relief.

19       With regard to the application of the AEPDA, DeLongis contends that the appellate

20   court's decision was "objectively unreasonable" since it failed to consider evidence relevant

21   to the instruction issue. DeLongis claims that the appellate court overlooked the testimony

22   of ImObersteg and Dr. Alvarez. He further argues that the appellate court failed to consider

23   a tape recording of a police interrogation that was played for the jury. Accordingly,

24   DeLongis asserts that the AEDPA is not a barrier to relief.

25       In opposition, the State contends that DeLongis' defense theory was that the offense

26   resulted from provocation by DeLongis's wife. The State asserts that various passages

27   from DeLongis' opening and closing arguments reveal that the defense's focus was on heat

28   of passion rather than intoxication. The State then maintains that the appellate court's

United States District Court

For the Northern District of California

1   determination of the instruction issue was fully supported by the record.

2       With regard to the application of AEDPA, the State asserts that DeLongis has failed

3   to identify a Supreme Court ruling that supports DeLongis' position.  The State contends

4   that *Matthews* simply interpreted federal procedural rules relating to use of the entrapment

5   defense, and that it did not establish a constitutional rule regarding defense instructions.

6   Accordingly, the State maintains that *Matthews* is inapplicable for AEDPA purposes.

7   Lastly, the State argues that, in light of the abundance of evidence that DeLongis killed with

8   malice aforethought, any error by the trial court on the intoxication instruction issue was

9   harmless.

10      This court finds that the appellate court's decision was not an unreasonable

11  application of Supreme Court law, nor was it based on an unreasonable determination of

12  facts.  Under California law, a defendant charged with murder may show that, due to

13  voluntary intoxication, he or she did not harbor malice aforethought.  *See People v. Saille*,

14  54 Cal.3d 1103, 1116-17 (1991).  If the jury finds that the defendant did not harbor malice

15  aforethought, it may only convict the defendant of involuntary manslaughter.  *Id.*  The Ninth

16  Circuit has repeatedly held that a state trial court's refusal to give an instruction on a

17  defense theory that is supported by sufficient evidence presents a cognizable federal

18  habeas corpus claim.  *See, e.g., Bradley*, 315 F.3d at 1098 (failure to instruct on

19  entrapment theory of defense violated due process); *U.S. v. Johnson*, 459 F.3d 990, 993

20  (9th Cir. 2006) (criminal defendant has constitutional right to have the jury instructed

21  according to his theory of the case if it has some foundation in evidence).  These cases

22  relied on the Supreme Court's decision in *Matthews*, which held that "a defendant is entitled

23  to an instruction as to any recognized defense for which there exists evidence sufficient for

24  a reasonable jury to find in his favor."  485 U.S. at 63.  Given the abundance of recent Ninth

25  Circuit authority, the State's reliance on *Bueno v. Hallahan*, 988 F.2d 86, 88 (9th Cir. 1993),

26  which held that the *Matthews* holding is not compelled by the Constitution, is unpersuasive.

27  Accordingly, DeLongis' claims are assessed under *Matthews* and its progeny.

28      In this case, DeLongis failed to present sufficient evidence at trial to support an

United States District Court

For the Northern District of California

1   intoxication defense, and the appellate court's decision was therefore not an unreasonable

2   application of federal law.  As noted above, the appellate court assessed whether or not

3   DeLongis had presented evidence concerning the effect of his intoxication on the presence

4   of the mental state of malice.  The appellate court examined DeLongis' own testimony, as

5   well as that of ImObersteg and Dr. Alvarez, and determined that none of the evidence

6   pertained to the effect of DeLongis' intoxication on his ability to form the intent to kill.  This

7   finding did not constitute an unreasonable determination of the facts or an unreasonable

8   application of federal law.

9        DeLongis' testimony and that of his experts, as well as the defense counsel's closing

10  arguments, all show that there was insufficient evidence to support a voluntary intoxication

11  instruction.  As described above, DeLongis testified about his long-term alcohol

12  dependence and his alcohol consumption before the incident.  However, his testimony

13  about the effects of his intoxication, to the extent there was any, did not pertain to his ability

14  to form the mental state of malice.  With regard to the experts, ImObersteg testified about

15  the effects of alcohol consumption on certain mental processes, but she did not address

16  the effects of intoxication on the criminal mental states at issue in this case.  Similarly, Dr.

17  Alvarez briefly discussed DeLongis' alcohol dependence, but he did not address DeLongis'

18  intoxication on the morning of the incident.  Furthermore, the tape-recorded conversation

19  between DeLongis and Officer Timothy Harrison that was played for the jury does not, as

20  DeLongis claims, contain evidence indicating that his mental state was impaired due to

21  intoxication.  CT 37-66; RT 713-14.  To the contrary, the transcript of the recording

22  indicates that DeLongis was acutely aware of the situation and could carry on a normal and

23  extended conversation with Officer Harrison.

24       With regard to defense counsel's closing argument, a review of his comments

25  indicates that heat of passion, and not voluntary intoxication, was the primary defense

26  theory.  In the introductory remarks of his summation, defense counsel stated:

27       I'm going to suggest to you as we go through the evidence that the evidence
         is more consistent with a heat of passion type of killing.  But I don't have to do
28       that.  They have to prove that it's not.  But I think in this case, the evidence

15

United States District Court

For the Northern District of California

1    shows that it was more consistent with heat of passion.

RT 1277.  Though defense counsel also discussed DeLongis' alcohol consumption and blood alcohol level on the morning of the homicide, he stated, "nobody is saying here that this man was so drunk that he had no clue what he was doing on that day . . . [T]hat's not what is going on here, okay?  It's a part.  It's a part of what occurred here."  RT 1283. DeLongis' attorney explicitly stated that DeLongis' intoxication precluded him from harboring malice aforethought on only one brief occasion amidst the lengthy closing argument.  RT 1312-13.  On that occasion, defense counsel stated "the Judge has instructed you that intoxication can reduce express malice, this mental disorder can reduce express malice.  There's no way that this can be a premeditated crime."  Id.  But as is evident from the wording and the context of the statement, DeLongis' attorney was suggesting only that the intoxication precluded a first-degree murder conviction, rather than any murder conviction as DeLongis now maintains.

Instead of asserting that DeLongis did not harbor malice due to intoxication, defense counsel repeatedly suggested that, on the morning of the offense, DeLongis "snapped, that he lost it, that he just went into a rage . . . and he was just gone, out of it[.]"  RT 1289-90; see also RT 1294 ("This was a rage reaction . . . [I]t is an emotional response to a provocation that occurred at the top of the stairs."); RT 1298 (DeLongis' behavior was "consistent with a rage response."); RT 1308 (the behavior was "consistent with a man who snapped"); RT 1314 ("What we have here is an absolutely immediate response, an immediate response to provocation[.]); RT 1315 ("Heat of passion.  I suggest to you we have heat of passion in this case.").

In light of DeLongis' testimony, the testimony of his experts, and his attorney's closing argument, there was not substantial evidence to support a CALJIC 4.21.1 instruction, and the trial judge need not have given the instruction.  See Hendricks v. Vasquez, 974 F.2d 1099, 1107 (9th Cir. 1992) ("[u]nder California law, a trial judge need not give a requested instruction for which there is no substantial evidence in support").

16

United States District Court

For the Northern District of California

1  Accordingly, the state appellate court made a reasonable determination of the facts, and a

2  reasonable application of the law, in finding that the evidence did not support a CALJIC

3  4.21.1 instruction.

4       Finally, the appellate court's harmless error analysis was not an unreasonable

5  application of federal law, nor was it based on an unreasonable determination of the facts.

6  The appellate court found that even if CALJIC 4.21.1 was supported by substantial

7  evidence, the trial court's failure to give the instruction was not prejudicial error because it

8  was not reasonably probable that a result more favorable to the defendant would have

9  been reached absent the error.  *People v. Ervin*, 22 Cal.4th 48, 90-91 (2000); *People v.*

10 *Lee*, 20 Cal.4th 476, 62-63 (1999).  The appellate court noted that the trial judge correctly

11 instructed the jury on the lesser offense of manslaughter based upon heat of passion and

12 provocation, along with the definition of voluntary intoxication.  Accordingly, the appellate

13 court concluded that even without CALJIC 4.21.1, the jury could still have found that

14 DeLongis' intoxication precluded the possibility that he harbored malice aforethought.

15      In habeas proceedings, a federal court may grant relief based on trial error only

16 when that error "'had a substantial and injurious effect or influence in determining the jury's

17 verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. U.S.*, 328

18 U.S. 750, 776 (1946)).  The error is not harmless if the court is "in grave doubt as to the

19 harmlessness of [the] error." *California v. Roy*, 519 U.S. 2, 5 (1996) (quoting *O'Neal v.*

20 *McAninch*, 513 U.S. 432, 437 (1995)).  Given the paucity of evidence regarding the effect

21 of DeLongis' intoxication on his ability to harbor malice aforethought, and given the

22 comprehensiveness of the jury instructions as a whole, this court finds that even if the

23 failure to instruct on CALJIC 4.21.1 was error, it did not have a substantial and injurious

24 effect on the jury's verdict.

25 **II.   The Trial Court's Mental Disorder Instruction did not Violate DeLongis' Fifth or
        Sixth Amendment Rights**

26

27      DeLongis also contends that his constitutional rights were violated because the trial

28 judge's modifications of CALJIC 3.32 did not directly refer to second-degree murder.  The

unmodified CALJIC 3.32 provides:

> You have received evidence regarding a [mental disease] [mental defect] [or] [mental disorder] of the defendant ___ at the time of the commission of the crime charged [namely, ] [in Count[s] ][.] [or a lesser crime thereto, namely ]. You should consider this evidence solely for the purpose of determining whether the defendant ___ actually formed [the required specific intent,] [premeditated, deliberated] [or] [harbored malice aforethought] which is an element of the crime charged [in Count[s] ], namely, [.] [or the lesser crime[s] of ].

## A.    Background

At trial, DeLongis presented evidence of an alleged mental disorder through the testimony of Dr. Alvarez and Dr. Megan Burnes ("Dr. Burnes"), a psychiatrist at the Sonoma County Jail.  Dr. Alvarez testified that DeLongis suffered from the following Axis I disorders: alcohol dependence, panic disorder with agoraphobia, and adjustment disorder with mixed anxiety and depression.[4]  RT 1042-43.  With regard to Axis II, Dr. Alvarez testified that DeLongis suffered from a personality disorder with passive aggressive, paranoid, and dependent traits.  RT 1044.  Dr. Alvarez then testified that DeLongis' mental disorder made him susceptible to a "rage reaction."  RT 1056-57.  However, the trial court did not permit Dr. Alvarez to testify about the effects of these symptoms or disorders on DeLongis' mental state during the offense.  RT 1035-1041 (discussion outside presence of jury regarding trial judge's earlier ruling that Dr. Alvarez could not testify as to DeLongis' state of mind at the time of the offense); RT 1055 (objection sustained on this basis).  Dr. Burnes subsequently testified that she diagnosed DeLongis with alcohol withdrawal shortly after he arrived at the Sonoma County Jail.  RT 1129.  She went on to describe DeLongis' symptoms of alcohol withdrawal.  RT 1130-31.

At the close of evidence, defense counsel requested that the court instruct the jury pursuant to CALJIC 3.32.  RT 1167.  Both the prosecution and trial judge expressed doubt regarding the sufficiency of the evidence of a mental disorder to support giving CALJIC 3.32.  RT 1167-69.  Defense counsel, however, convinced the court to give the instruction

---

[4] Dr. Alvarez based his findings on the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV").  RT 1033-34; 1061.

United States District Court

For the Northern District of California

1   based on Dr. Alvarez's findings.  RT 1168.

2          The court then had to decide on three modifications, reflected by optional "bracketed

3   phrases," of the form instruction, including: (1) whether the instruction would apply to

4   evidence of mental illness, mental disorder or mental defect; (2) which criminal mental

5   states the instruction would apply to; and (3) which charges the instruction would apply to.

6   First, the trial judge decided that the instruction would only apply to mental disorder because

7   DeLongis had not presented evidence of mental illness or defect.  RT 1170.  Second, as to

8   mental states, the trial judge decided to instruct the jury that it may consider whether the

9   mental disorder evidence negated premeditation, deliberation or malice aforethought.  RT

10  1170.  Third, the trial judge appears to have adopted the prosecutor's suggestion that the

11  instruction apply only to the "homicide count . . . or the first-degree elements" rather than to

12  "273.5," the corporal injury upon a spouse count.  RT 1170.  It is unclear if the trial judge's

13  acquiescence to the prosecutor's suggestion meant that he intended the instruction to apply

14  only to first-degree murder, or to first-degree murder and any lesser-included offenses.[5]

15  Ultimately and as discussed below, however, the dispositive issue is how a reasonable jury

16  _____

17          [5] The colloquy described above was as follows:

18  Prosecution: This [instruction] would be in regards to – because in the
            bracketed it shows the murder [sic].  Is counsel suggesting this to
19          negate the general intent for the 273.5 well [sic].

20  Defense:    I don't think I can do that.

21  Prosecution: So this is only as to the homicide count, required specific intent or
            the first degree elements.

22  Court:      The other bracketed phrase that I have to decide is whether I use
23          required specific intent, premeditated, deliberate or the third,
            harbored malice aforethought since we're talking about murder in
24          the first degree.  And I've already indicated under 3.31.5 what the
            mental state is.  Required.  I should then use the third bracketed
25          phrase harbored malice aforethought.

26  Defense:    And also premeditated or deliberate [sic].
        . . .

27  Court:      All right.  I'll use all thee [sic] bracketed phrase [sic].

28  R.T. 1170.

19

United States District Court
For the Northern District of California

1 would have understood the instruction, and *not* how the trial judge intended it to be

2 understood.

3      Based on these decisions, the trial judge instructed pursuant to CALJIC 3.32 as

4 follows:

> You have received evidence regarding mental disorder of the
> defendant at the time of the commission of the crimes charged in counts one
> and two; namely, first degree murder and willful infliction of a traumatic injury
> upon one's spouse.  You should consider this evidence solely for the purpose
> of determining whether the defendant actually premeditated, deliberated or
> harbored malice aforethought which is an element of the crime charged in
> count one; namely, first degree murder.

9 RT 1222-23; 1336-37.

10      A careful review of the transcript reveals that defense counsel did not object to the

11 court's reading of CALJIC 3.32, nor does DeLongis contend that his trial attorney objected

12 to the form of the instruction.[6]  Nevertheless, DeLongis now contends that, by failing to

13 reference second-degree murder in CALJIC 3.32, the trial court denied him of his rights

14 under the Fifth and Sixth Amendments.

15     **B.**    **Legal Standards**[7]

16      Under California law, if evidence of mental illness raises a reasonable doubt that a

17 defendant premeditated or deliberated, but other evidence establishes that he harbored

18 malice aforethought, then he is guilty of second-degree murder.  *People v. Halvorsen*, 42

19 Cal.4th 379, 414 (2007) (citing *Saille*, 54 Cal.3d at 1117).  However, if such evidence

20 negates malice aforethought, the only supportable verdicts are involuntary manslaughter or

21 acquittal.  *Id.*  California Jury Instruction 3.32, which provides guidance on how the jury may

22 consider mental disorder evidence with respect to certain required mental states, is in the

23

24     [6]  Again, there is no procedural default issue because the state appellate courts never
25 considered whether DeLongis had waived his claim based on counsel's failure to object.

26     [7]As noted previously, because the California Supreme Court issued only a postcard
denial of DeLongis' habeas petition, there is no written, reasoned state court decision on the
27 mental disorder instruction issue.  Accordingly, this court has conducted an independent
review of the record and the relevant federal law in determining whether the state court's
28 decision on the issue was "contrary to, or involved an unreasonable application of, clearly
established federal law."  *Delgado*, 223 F.3d at 982.

United States District Court

For the Northern District of California

1   nature of a pinpoint instruction that must be given only on request and where the evidence

2   supports the defense theory.  *See People v. Ervin*, 22 Cal.4th 48, 91 (2000).

3       The federal legal standards described above regarding defective jury instructions

4   apply here as well, with the exception of those standards which address a trial court's

5   alleged failure to give a certain instruction.  Unlike DeLongis' claim about the failure to

6   instruct on voluntary intoxication, the issue here is not omission of an instruction, but the

7   alleged ambiguity or erroneousness of the instruction.

8       In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could

9   or would have understood the instruction as a whole; rather, the court must inquire whether

10  there is a "reasonable likelihood" that the jury has applied the challenged instruction in a

11  way that violates the Constitution.  *Estelle*, 502 U.S. 62, 72 & n.4 (1991); *Boyd v. California*,

12  494 U.S. 370, 380 (1990).  However, a determination that there is a reasonable likelihood

13  that the jury has applied the challenged instruction in a way that violates the Constitution

14  establishes only that an error has occurred.  *See Calderon v. Coleman*, 525 U.S. 141, 146

15  (1998).  If an error is found, the court also must determine whether the error had a

16  substantial and injurious effect or influence in determining the jury's verdict, *see Brecht*,

17  507 U.S. at 637, before granting relief in a habeas proceeding.  *See Calderon*, 525 U.S. at

18  146-47; *see, e.g.*, *Sarausad v. Porter*, 479 F.3d 671, 679 (9th Cir. 2007) (finding

19  reasonable likelihood that jury applied ambiguous instruction on accomplice liability to find

20  petitioner guilty of murder in a way that relieved the State of its burden of proof, and that

21  this error was not harmless).

22      However, if the disputed instruction is erroneous on its face, the "reasonable

23  likelihood" standard employed for ambiguous jury instructions is not required.  *Ho v. Carey*,

24  332 F.3d 587, 592 (9th Cir. 2003).  For example, if a jury instruction omits a necessary

25  element of the crime, constitutional error has occurred.  *Id.*; *see also id.* at 593 (finding jury

26  instructions "erroneous" rather than ambiguous, where they included an uncorrected

27  erroneous instruction that second-degree murder could be based on a finding of general

28  intent, but also included an accurate description of the elements of second-degree murder,

United States District Court
For the Northern District of California

1   including specific intent).  Actual prejudice is still required before relief may be granted,

2   however.  *See id.* at 595 (citing *Brecht*, 507 U.S. at 637).

3      **C.    Analysis**

4         As noted above, the California Supreme Court denied DeLongis' CALJIC 3.32 claim

5   with a postcard denial.  This court nevertheless presumes that the California Supreme

6   Court denied DeLongis' claim on the merits.  *See Larue v. McCarthy,* 833 F.2d 140, 143

7   (9th Cir. 1987) (California Supreme Court's postcard denials are considered adjudications

8   on the merits).

9         DeLongis argues that the trial court's failure to specifically reference second-degree

10  murder in its CALJIC 3.32 instruction violated his constitutional rights.  DeLongis contends

11  that the instruction, by stating that it only applied to first-degree murder, forced the jury to

12  consider only whether his mental disorder negated malice aforethought for first-degree

13  murder purposes, when in fact mental disorder can negate malice aforethought for either

14  first or second-degree murder.  DeLongis further maintains that this error requires

15  automatic relief without harmless error review because it constitutes a "structural defect[] in

16  the constitution of the trial mechanism."  *See Brecht,* 507 U.S. at 629.  Thus, DeLongis

17  contends that the instruction is facially erroneous, not merely ambiguous, and accordingly

18  that it should be insulated from harmless error review.  The State does not address the

19  CALJIC 3.32 issue in its opposition.

20        California Jury Instruction 3.32 permits a trial court to list which counts the jury

21  should consider in its assessment of the effect of a defendant's disorder on the requisite

22  mental states.  CALJIC 3.32.  The unmodified instruction then permits a trial court to

23  include the phrase "and lesser included offenses, namely . . . ."  *Id.*  Since malice

24  aforethought is a requisite mental state for both first and second-degree murder, *Saille*, 54

25  Cal.3d at 1117, a jury could not rationally acquit a defendant of first-degree murder

26  because he did not harbor malice aforethought, and yet still convict him or her of second-

27  degree murder.  *Id.*  Accordingly, a more technically complete instruction would read, in

28  pertinent part, as follows: "You should consider this evidence solely for the purpose of

United States District Court

For the Northern District of California

1    determining whether the defendant actually premeditated, deliberated or harbored malice

2    aforethought which is an element of the crime charged in count one; namely, first-degree

3    murder, or the lesser crime of second degree murder."  Given the trial court's failure to

4    reference second-degree murder, this court must determine whether the error was

5    "erroneous on its face" or merely ambiguous.

6         The trial court's version of CALJIC 3.32 was ambiguous, rather than facially

7    erroneous.  The Ninth Circuit has found an instruction to be erroneous in cases where the

8    instruction omits a necessary element of the crime.  *See Wade*, 29 F.3d at 1321, *overruled*

9    *on other grounds*, *Rohan ex rel Gates v. Woodford*, 334 F.3d 803, 815 (9th Cir. 2003); *Ho*,

10   332 F.3d at 592.  Other examples include errors that allow proof of an element of a crime

11   on a standard less demanding than beyond a reasonable doubt, *see Sandstrom v.*

12   *Montana*, 442 U.S. 510, 524-27 (1979), or when the error ambushes the defense with an

13   instruction that changes the theory of the case at the last minute.  *See Sheppard v. Rees*,

14   909 F.2d 1234, 1237-38 (9th Cir. 1989).  These types of instructional errors are considered

15   structural and thus are not subject to harmless error review.  *Id.*

16        Here, however, the instructional infirmity did not omit an element of second-degree

17   murder, nor did it improperly reduce the burden of proof.  Moreover, the challenged

18   instruction did not contain any explicit misstatement of law.  *Sarausad*, 479 F.3d at 690

19   (concluding that the lack of an explicit misstatement of law in contested jury instruction

20   rendered it ambiguous rather than erroneous).  The only inaccuracy of the trial court's

21   modification was its failure to specify that a particular defense applied to a lesser-included

22   offense as well as to the top count of a charge.  Lastly, and as described below, the

23   instruction is susceptible to multiple reasonable interpretations.  The Ninth Circuit has found

24   that when an instruction is subject to multiple reasonable interpretations, that instruction is

25   more likely to be ambiguous rather than flatly erroneous.  *See Mejia v. Garcia*, --- F.3d ---,

26   2008 WL 2853384, at *6 (9th Cir. 2008) ("[t]hat reasonable minds can differ in their reading

27   of whether [an] instruction allows for conviction . . . on a burden of proof other then beyond

28   a reasonable doubt underscores the instruction's ambiguity").

United States District Court

For the Northern District of California

1    Since the instructional error was ambiguous, the next inquiry is whether there is a

2  "reasonable likelihood" that the jury has applied the challenged instruction in a way that

3  violates the Constitution. *Estelle*, 502 U.S. at 72 & n.4; *Boyd v. California*, 494 U.S. 370,

4  380 (1990).  Thus, the question before the court is whether the trial court's instruction

5  created a reasonable likelihood that the jury read the instruction to permit conviction on

6  second-degree murder even if it found that DeLongis did not harbor malice due to his

7  mental disorder.  If this were the case, the defective instruction would have allowed the

8  prosecution to convict DeLongis of second-degree murder without needing to prove malice

9  aforethought.  Such an effect would constitute a denial of Due Process.  *See In re Winship*,

10  397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against

11  conviction except upon proof beyond a reasonable doubt of every fact necessary to

12  constitute the crime with which he is charged").  To determine if the jury instruction rose to

13  the level of constitutional error, the court should assess it "in the context of the instructions

14  as a whole and the trial record." *Estelle*, 502 U.S. at 72.

15    A review of the entire jury charge shows that it is not reasonably likely that the jury

16  interpreted the modified instruction in an unconstitutional manner.  The wording of the

17  instruction itself did not necessarily forbid the jury from considering DeLongis' alleged

18  disorder to determine if he harbored the requisite mental state for second-degree murder.

19  The judge instructed the jury to consider the disorder evidence "solely for the purpose of

20  determining whether the defendant actually premeditated, deliberated or harbored malice

21  aforethought, which is an element of the crime charged in Count One, namely, first-degree

22  murder."  RT 1221-23.  Though the judge's syntax could lead a reasonable juror to believe

23  that the word "solely" applied to the listed mental states *and* to first-degree murder, it could

24  also lead a reasonable juror to believe that "solely" applied only to the listed mental states.

25  A reasonable juror might also believe that "solely" was used to emphasize that the

26  instruction applied only to count one (first-degree murder and lesser-included offenses),

27  rather than to both counts one and two (corporal injury upon a spouse), which are

28  referenced in the first half of the instruction.  The second and third interpretations would

24

United States District Court

For the Northern District of California

1   permit the jury to apply the instruction to any of the charged crimes requiring one or more

2   of the listed mental states.  That the instruction specifies "count one," rather than simply

3   "first-degree murder," makes the unconstitutional interpretation even less plausible because

4   second-degree murder was a lesser-included offense listed under count one.

5          Finally, the remainder of the jury instructions would likely have cured any infirmity in

6   the mental disorder instruction.  The judge correctly instructed that, to convict DeLongis of

7   second-degree murder, "there must exist a union or joint operation of fact or conduct and a

8   certain mental state in the mind of the perpetrator.  Unless this mental state exists, the

9   crime to which it relates is not committed."  RT 1221.  The trial court also properly laid out

10  the elements necessary for a second-degree murder conviction.  RT 1225.  Lastly, the

11  instructions correctly defined malice aforethought, and distinguished between express and

12  implied malice.  RT 1223-24.  In sum, though the disorder instruction may have been

13  technically incomplete, it is not "reasonably likely" that it was applied in a manner that

14  violates the Constitution.  This court may not grant relief, as might a state appellate court,

15  "simply because the instruction may have been deficient in comparison to the CALJIC

16  model."  *Estelle*, 502 U.S. at 72.

17         Even if the jury did apply the defective instruction in an unconstitutional manner,

18  DeLongis would still have to show that the instruction resulted in "actual prejudice," *United*

19  *States v. Lane*, 474 U.S. 438, 449 (1986), because it had a "substantial and injurious effect

20  or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637.  However, there

21  was ample evidence that DeLongis acted with implied malice such that any error would be

22  harmless.  DeLongis testified that, in the moments before the incident, he hated his wife.

23  RT 923.  He then admitted to kicking her down a flight of stairs, grabbing her by the hair

24  and smashing her head into the floor, and then putting his arms around her neck.  RT 923-

25  24; RT 974.  He later testified that he strangled her.  RT 981.  A pathologist who inspected

26  the crime scene testified that he believed a hole in the wall midway down the stairs was

27  caused by DeLongis ramming Kim's head through the wall.  RT 695, 800-02.  Moreover,

28  Dr. Alvarez was not permitted to testify about the effect of DeLongis' purported mental

1   disorders at the time of the offense.  RT 1035-1041.

2       Furthermore, a review of the parties' closing arguments reveals that neither counsel

3   exacerbated the instructional error, and that their statements regarding the pertinent law

4   were correct.  *See, e.g., Polk v. Sandoval*, 503 F.3d 903, 912-13 (9th Cir. 2007) (finding

5   that instructional error was not harmless in part due to prosecutor's misstatement of the

6   law).  Both sides correctly noted that the jury must find that DeLongis harbored malice

7   aforethought in order to convict him of murder.  RT 1243, 1276.  More importantly, neither

8   the defense nor the prosecution intimated, in their closing arguments, that evidence of

9   mental impairment could negate the mental states for first-degree murder but not for

10  second-degree murder.  In light of the abundant evidence of malice aforethought, and given

11  the absence of any exacerbating argument by trial counsel, any constitutional infirmity in

12  the instructions was harmless.

13      Since there was not a reasonable likelihood that the jury applied the mental disorder

14  instruction in a manner that could have deprived DeLongis of his Constitutional rights, the

15  California Supreme Court's denial did not unreasonably apply clearly established federal

16  law, nor was it based on an unreasonable determination of facts.  The court therefore

17  denies DeLongis' claim regarding CALJIC 3.21.

18                              **CONCLUSION**

19      For the reasons set forth above, DeLongis' petition for writ of habeas corpus is

20  DENIED because the appellate court's decision was neither contrary to, nor an

21  unreasonable application of, clearly established federal law; nor was it based on an

22  unreasonable determination of the facts in light of the evidence presented.  This order fully

23  adjudicates this case and terminates all pending motions.  The clerk shall close the file.

24      **IT IS SO ORDERED.**

25  Dated: August 28, 2008

26

27                              _____

28                              PHYLLIS J. HAMILTON
                                United States District Judge